IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| ERIKA ROBERTSON, | § | |
| Plaintiff | § | |
| V. | § | |
| | § | |
| CITY OF BASTROP, BRANDON NEWTON, AND CLINT NAGY, IN THEIR INDIVIDUAL CAPACITIES, | § | A-14-CV-0839-SS |
| Defendants. | § | |

**ORDER**

On this day the Court considered the Motion for Summary Judgment [Dkt. #23] filed on July 17, 2015 by Defendants, the City of Bastrop, Brandon Newton, and Clint Nagy. The Plaintiff, Erika Robertson, requested and was granted an extension of time until October 14, 2015 to respond to the Motion for Summary Judgment. *See* Order of July 31, 2015 [Dkt. #25]. As of October 28, 2015, no response has been filed, nor any further extension requested. Pursuant to Local Rule CV-7(e), the Motion for Summary Judgment [Dkt. #23] is unopposed. The Court nevertheless considers the motion on its merits, as required by Federal Rule of Civil Procedure 56(a). Having considered the record evidence, relevant legal authorities, and the case file as a whole, the Court GRANTS Defendants' Motion for Summary Judgment [Dkt. #23] for the reasons outlined in detail below.

I. **BACKGROUND**

The facts recited below are taken from the summary judgment affidavits and incident reports generated by the officers responding to the scene. *See generally* Mot. Summ. J. [Dkt. #23], Exhibits A-F. These statements are further corroborated by the patrol car video recordings taken on the scene. *Id.* at Exhibit A, Attachments F and G. As noted above, Plaintiff has failed to respond to the Motion for Summary Judgment or otherwise provide any competent evidence

1

to rebut the sworn affidavits, contemporaneous incident reports, and video footage provided by Defendants.[1]

On the evening of January 13, 2013, at approximately 10:00 P.M., Corporal Ryan Preston and Officer John Dubose responded to a dispatch report concerning a "suspicious male wearing a black colored trench coat and banging on the back door" of the Bastrop Volunteer Fire Department Station #1. *Id.* at Ex. C, Aff. Ryan Preston, Attachment B, Preston Incident Report. Officers Preston and Dubose were the first on the scene. *Id.* at Ex. D, Aff. John Dubose, Attachment B, Dubose Incident Report. At the time of the incident, Corporal Preston had been a certified Mental Health Officer for over a year and had undergone Crisis Intervention Training. *Id.* at Ex. C, Attachmt. A, Tex. Comm'n on Law Enforcement Personal Information Report for Ryan Preston. Officer Dubose had also undergone Crisis Intervention Training. *Id.* at Ex. D, Attachmt. A, Tex. Comm'n on Law Enforcement Personal Information Report for John Dubose.

On responding to the scene, it was immediately apparent "[t]he suspicious male was actually a female," later identified as Plaintiff, Erika Robertson. Ex. C, Attachmt. B, Preston Incident Report. Corporal Preston and Officer Dubose began attempting to engage Robertson in conversation. *Id.* Officer Brandon Newton arrived on the scene while this conversation was taking place. Ex. B, Attachmt. B, Newton Incident Report. Officer Newton, like Corporal Preston and Officer Dubose, had undergone Crisis Intervention Training prior to this incident.

---

[1] The factual allegations in Plaintiff's complaint are not competent summary judgment evidence. *Mississippi River Basin Alliance v. Westphal*, 230 F.3d 170, 174 (5th Cir. La. 2000). The Court further notes Plaintiff's factual allegations are materially incomplete: Robertson never once mentions that she was holding (and refusing to surrender) a kitchen knife with a four-inch long blade the entire time she was "asking for help." *See generally* Compl. [Dkt. #1] at 2-8 ("Facts"). Yet the video recording taken from the squad car #59 clearly shows Robertson picking up a large kitchen knife as the squad car pulled up, and the officers are clearly audible on the audio recording from squad car #61, repeatedly asking Robertson to put down the knife so they can help her. Mot. Summ. J. Ex. A, Nagy Aff., Attachmt. F, squad car recordings.

*Id.* at Attachmt. A, Tex. Comm'n on Law Enforcement Personal Information Report for Brandon Newton.

As Corporal Preston and Officer Dubose were talking to Robertson, Officer Dubose noticed that Robertson put her right hand in the pocket of her jacket. Ex. D, Attachmt. B, Dubose Incident Report. Officer Dubose asked Robertson to remove her hand from the pocket. *Id.* When she did so, Officer Dubose saw the end of a knife handle. *Id.* He advised the other officers on the scene that Robertson had a knife. *Id.* Both Officer Dubose and Corporal Preston asked Robertson to put the knife down, but instead she placed the blade to her wrist and began making a cutting motion. *Id.*; *see also* Ex. C, Attachmt. B, Preston Incident Report. Officer Newton, seeing this escalation, notified dispatch to call EMS to the scene. Ex. B, Attachmt. B, Newton Incident Report; Ex. C, Attachmt. B, Preston Incident Report.

Sergeant Clint Nagy, a licensed Advanced Peace Officer who, like the other officers on the scene, had undergone 16 hours of Crisis Intervention Training prior to the incident in question, arrived on the scene next. Ex. A, Attachmt. A, Tex. Comm'n on Law Enforcement Personal Information Report for Clint Nagy; *Id.* at Attachmt. E, Nagy Incident Report. As Sergeant Nagy exited his patrol unit, Corporal Preston advised him that Robertson had a knife to her wrist. *Id.* at Attachmt. E, Nagy Incident Report. Sergeant Nagy saw the knife and observed that the blade was about four inches long. *Id.* He saw that Robertson "had the knife pressed against her left wrist to the skin." *Id.* Each of the officers asked Robertson to put down the knife. *Id.*; see also Ex. C, Attachmt. B, Preston Incident Report. Robertson refused. Ex. A, Attachmt. E, Nagy Incident Report; Ex. B, Attachmt. B, Newton Incident Report; Ex. C, Attachmt. B, Preston Incident Report; Exhibit D, Attachmt. B, Dubose Incident Report.

Robertson, still pressing the knife to her wrist, stated she needed to throw up and wanted to enter the fire station to use the restroom. *Id.* Violet Schnieder, the volunteer firefighter who had called the police to the scene, was still alone inside the fire station, and Sergeant Nagy felt he could not let Robertson enter the building with her while Robertson remained armed. Ex. A, Aff. Clint Nagy, ¶ 7; Ex. E, Aff. Violet Schneider, Attachmt. A, Schneider Witness Statement. Nagy instructed Robertson that he could not let her go inside unless she put the knife down. Ex. A, Attachmt. F, video/audio recording from Unit #62. Robertson again refused to let go of the knife and instead began walking towards a dark area on the east side of the building that "had multiple hazards to officers and Robinson [*sic*] due to physical objects such as rebar, fires hoses [*sic*] and heavy equipment crammed in the area." Ex. C, Attachmt. B, Preston Incident Report; *see also* Ex. A, Attachmt. E, Nagy Incident Report; Ex. B, Attachmt. B, Newton Incident Report; Ex. D, Attachmt. B, Dubose Incident Report.

Sergeant Nagy "believed that allowing Robertson to reach the corner of the station would put [the officers] at a tactical disadvantage because there were obstacles and it was dark there." Ex. A, Aff. Clint Nagy, ¶ 8. Nagy also believed he saw an opportunity to stop Robertson from reaching the dark corner of the building when she turned her back to him. *Id.* He "grabbed [Robertson] by her upper arms to move the knife away from her body." *Id.*; *see also* Ex. B, Attachmt. B, Newton Incident Report; Ex. C, Attachmt. B, Preston Incident Report; Ex. D, Attachmt. B, Dubose Incident Report. Corporal Preston described Sergeant Nagy's hold on Robertson as a "bear hug" that spun her around. Ex. C, Attachmt. B, Preston Incident Report.

Sergeant Nagy was able to pull the knife away from Robertson, but began to lose his own balance as he slipped on rebar. Ex. A, Aff. Clint Nagy, ¶8; *see also Id.* at Attachmt. F, video/audio recording from Unit #62, video recording from Unit #59. At this point, Officer

Newton, who could not see where the knife was and who "fear[ed] that Sergeant Nagy may be cut or stabbed," deployed his Taser. Ex. B, Attachmt. B, Newton Incident Report. The taser struck Robertson in the abdomen and on her left thigh. *Id.*; *see also* Ex. A, Attachmt. C, Witness Statement of Paramedic Michael Rogers; *id.* at Attachmt. D, Witness Statement of Paramedic Trent Grimes. Newton shocked Robertson with the taser for one cycle of approximately 5 seconds. Ex. B, Attachmt. B, Newton Incident Report; Ex. A, Attachmt. B, Taser Log; Ex. D, Attachmt. B, Dubose Incident Report.

Once the taser struck Robertson, she dropped the knife. Ex. C, Attachmt. B, Preston Incident Report. Corporal Preston secured the knife. *Id.* Sergeant Nagy caught Robertson as she was falling and controlled her descent to the ground so that her head and shoulders did not strike the pavement. Ex. A, Aff. Clint Nagy at ¶ 8. Sergeant Nagy handcuffed Robertson behind her back. *Id.* at ¶ 9. Once Robertson was securely handcuffed in a seated position, all of the officers stepped away from her. *Id.* at Attachmt. F, video/audio recording from Unit #62. The officers remained on the scene and continued to talk to Robertson, assuring her that help was on the way, until EMS arrived a few minutes later. *Id.*

Two paramedics examined Robertson and determined she was not injured and her vital signs were good. *Id.* at Attachmt. C, Witness Statement of Paramedic Michael Rogers; *id.* at Attachmt. D, Witness Statement of Paramedic Trent Grimes. Robertson's mother was called to the scene and, after Sergeant Nagy explained the incident to her, she agreed to take responsibility for her and stated her intention to drive Robertson to the Austin State Hospital for a psychiatric evaluation. Ex. A, Aff. Clint Nagy at ¶ 11; *see also id.* at Attachmt. C, Witness Statement of Paramedic Michael Rogers. Robertson's mother signed a "refusal of treatment form," *id.*, and

Robertson was released to her mother's custody with no arrest or further action taken by the officers. Ex. A, Aff. Clint Nagy at ¶ 11; *id.* at Attachmt. E, Nagy Incident Report.

Robertson has now sued Sergeant Nagy, the officer who grabbed her in an attempt to secure the knife and stop her from walking into a dark, hazardous area, and Officer Newton, the officer who deployed the Taser to force Robertson to drop the knife once Sergeant Nagy grabbed her. Robertson alleges the officers' actions constituted excessive force in violation of the Fourth Amendment. Robertson also sues the City of Bastrop, alleging the City is liable for failure to train and supervise the officers and for a policy ratifying a culture of unreasonable use of force in detaining mentally ill citizens. Robertson additionally brings claims against the City alleging the City violated the ADA by not requiring its officers to undergo training designed to educate them on reasonable accommodations necessary to respond to mental health crises. The Defendants have moved for summary judgment on all of Plaintiff's claims.

## II.   STANDARD OF REVIEW

### A.   Summary Judgment Standard

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure only "if the movant shows there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986).

The party moving for summary judgment bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate[] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The non-movant must respond to the motion by setting forth

particular facts indicating that there is a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986); *Miss. River Basin Alliance v. Westphal*, 230 F.3d 170, 174 (5th Cir. 2000).

"After the non-movant has been given the opportunity to raise a genuine factual issue, if no reasonable juror could find for the non-movant, summary judgment will be granted." *Id.* Although, in this case, Plaintiff has failed to respond, the Court views the summary judgment evidence in the light most favorable to the non-movant. *Griffin v. United Parcel Serv., Inc.*, 661 F.3d 216, 221 (5th Cir. 2011).

### B.      Fourth Amendment Excessive Force Claims

Robertson's claims that the officers used excessive force when they grabbed her, tased her, and took her to the ground are analyzed under the Fourth Amendment. *See Bosarge v. Miss. Bureau of Narcotics*, 796 F.3d 435, 441 (5th Cir. 2015) ("although the Fourteenth Amendment is relevant because it applies the Fourth Amendment to the states, [Plaintiff's] claims of unlawful arrest and detention should be analyzed under the Fourth Amendment and not under the Fourteenth Amendment's Due Process Clause."); *Albright v. Oliver*, 510 U.S. 266, 273 (1994) ("Where a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that amendment, not the more generalized notion of 'substantive due process' must be the guide for analyzing these claims.'") (internal citations omitted).

To state a violation of the Fourth Amendment's prohibition on the use of excessive force, Plaintiff must establish "(1) an injury that (2) resulted directly and only from the use of force that was excessive to the need, and (3) the use of force was objectively unreasonable." *Bush v. Strain*, 513 F.3d 492, 501 (5th Cir. 2008). The standard for determining whether the use of force

7

is objectively unreasonable is well established: it is a fact sensitive inquiry that turns on the totality of the circumstances, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [s]he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor,* 490 U.S. 386, 396 (1989). Additional considerations that "may bear on the reasonableness or unreasonableness of the force used [include]: the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Kingsley v. Hendrickson,* 135 S. Ct. 2466, 2473 (2015). In cases such as this one, where it is undisputed the Plaintiff was not being placed under arrest for any suspected crime, "the only applicable factor . . . is whether [Plaintiff] 'posed an immediate threat to the safety of the officers or others.'" *Harris v. Serpas,* 745 F.3d 767, 772 (5th Cir. 2014) (citing *Graham,* 490 U.S. at 396). "The '[u]se of deadly force is not unreasonable when an officer would have reason to believe that the suspect poses a threat of serious harm to the officer or others.'" *Harris,* 745 F.3d at 772 (quoting *Mace v. City of Palestine,* 333 F.3d 621, 624) (5th Cir. 2003) (alterations in *Harris*).

### C.  Title II of the Americans With Disabilities Act

Congress enacted the Americans With Disabilities Act (ADA) "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). Title II of the ADA provides "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Public entities include "[a]ny State or

local government" and "[a]ny department, agency, special purpose district, or other instrumentality of a State or States or local government." 42 U.S.C. § 12131(1).

In general, to state a prima facie claim for discrimination under the ADA, a plaintiff must show: (1) he is a qualified individual within the meaning of the ADA; (2) he is being excluded from participation in, or being denied benefits of, services, programs, or activities for which the public entity is responsible, or is otherwise being discriminated against by the public entity; and (3) such exclusion, denial of benefits, or discrimination is by reason of his disability. *Melton v. Dallas Area Rapid Transit*, 391 F.3d 669, 671-72 (5th Cir. 2004). The Fifth Circuit has found, however, that "Title II [of the ADA] does not apply to an officer's on-the-street responses to reported disturbances or other similar incidents, whether or not those calls involve subjects with mental disabilities, prior to the officer's securing the scene and ensuring that there is no threat to human life." *Hainze v. Richards*, 207 F.3d 795, 801 (5th Cir. Tex. 2000).[2] Title II does apply to the actions of peace officers in "handling and transporting [a mentally ill person] to a mental health facility." *Id.* at 802 (citing *Pennsylvania Dep't Corr. v. Yeskey*, 524 U.S. 206 (1998)). But the Fifth Circuit is clear that the reasonable accommodation required by Title II only comes into play "[o]nce the area [is] secure and there [is] no threat to human safety." *Hainze*, 207 F.3d at 802.

D.  **Qualified Immunity**

The doctrine of qualified immunity affords protection from both litigation and liability to public officials, absent a showing that the official violated a constitutional right that was clearly

---

[2] The Supreme Court recently declined to pass on the issue of whether this articulation of the law is a correct application of the ADA, leaving *Hainze* the controlling precedent on this subject in the Fifth Circuit. *See City & Cnty. Of San Francisco v. Sheehan*, 135 S.Ct. 1765, 1772-74 (2015).

established at the time of the incident. *Siegert v. Gilley*, 500 U.S. 226, 231 (1991). Qualified immunity applies broadly to shield "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Braggs*, 475 U.S. 335, 341 (1986). "If reasonable public officials could differ on the lawfulness of the defendant's actions, the defendant is entitled to qualified immunity." *Blackwell v. Barton*, 34 F.3d 298, 303 (5th Cir. 1994) (internal citation omitted).

To evaluate a defendant's claim to qualified immunity, the court must determine (1) whether a constitutional violation attributable to defendant's conduct actually occurred; and (2) if the defendant's conduct violated the plaintiff's constitutional right, was the conduct nevertheless "objectively reasonable" in light of the clearly established law at the time of the violation? *Saucier v. Katz*, 533 U.S. 194, 200-01 (2001). If the court finds that one of the two elements is not met, the court need not decide the other element, and the court may address the elements in any order it wishes "in light of the circumstances of the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). A defendant is entitled to qualified immunity if the answer to either of the *Saucier* prongs is "no." *Id.*

Notably, "the usual summary judgment burden of proof is altered in the case of a qualified immunity defense." *Michalik v. Hermann*, 422 F.3d 252, 262 (5th Cir. 2005) (citing *Bazan v. Hidalgo County*, 246 F.3d 481, 489 (5th Cir. 2001)). "An officer need only plead his good faith, which then shifts the burden to the plaintiff, who must rebut the defense by establishing that the officer's allegedly wrongful conduct violated clearly established law." *Id.* The plaintiff "cannot rest on conclusory allegations and assertions but must demonstrate genuine issues of material fact regarding the reasonableness of the officer's conduct." *Id.*

### E.     *Monell* Liability

Municipal liability under Section 1983 requires proof of three elements:  (1) a policymaker, (2) a policy or custom, and (3) a violation of constitutional rights whose "moving force" is the policy or custom. *Pietrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (citing *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)).  A municipality cannot be vicariously liable for the actions of its individual peace officers. *Monell*, 436 U.S. at 691.  On the other hand, where municipal liability is predicated on a policy or custom that authorized an officer to take unconstitutional action against a citizen, the fact that the officer's conduct did not actually violate any constitutional right insulates the municipality from liability as well. *City of Los Angeles v. Heller,* 475 U.S. 796, 800 (U.S. 1986).  "[I]f a person has suffered no constitutional injury at the hands of the individual police officer," any alleged policy or procedure that "might have *authorized* the use of constitutionally excessive force is quite beside the point." *Id.*

This is not to say that a municipality can never be liable under Section 1983 in the absence of officer liability.  A Plaintiff can sue a municipality for its own alleged torts without suing any of its individual officers—as Robertson does here with her ADA claims.  *See, e.g., Peterson v. City of Fort Worth*, 588 F.3d 838, 848-51 (5th Cir. 2009) (examining excessive force claims brought solely against a municipality for the actions of its officers, who were not defendants).  Nevertheless, "*Monell* does not create a stand-alone cause of action under which a plaintiff may sue over a governmental policy, regardless of whether he suffered the infliction of a tort resulting from the policy." *Askins v. Doe*, 727 F.3d 248, 253-54 (2d Cir. 2013). *Id.*  Plaintiff "must show the violation of some specific constitutional right that resulted from the alleged

11

illegal policy" in order to establish liability. *Lafleur v. McClelland*, No. 15-20195, 2015 U.S. App. LEXIS 17409, *7 (5th Cir. Tex. Oct. 2, 2015).

### III. ANALYSIS

In light of the summary judgment evidence and legal authorities outlined above, Plaintiff's claims against all Defendants are meritless. The officers, responding to a prowler call, were confronted with Robertson, an overtly suicidal person who was pressing a large kitchen knife into her own wrist. Despite the officers' repeated efforts to talk Robertson into relinquishing the knife, Robertson refused to put it down. Instead, still holding the knife, Robertson began to move away from the officers towards a darkened corner of the building that was full of heavy equipment, rebar, and other obstacles. It is constitutionally permissible to use force—even deadly force—to restrain a suspect who is refusing to surrender a deadly weapon such as a knife. *See, e.g., Harris v. Serpas*, 745 F.3d 767, 770-71 (5th Cir. 2014); *Elizondo v. Green*, 671 F.3d 506, 510 (5th Cir. 2012). Sergeant Nagy's use of a "bear hug" hold to gain control of the knife and Officer Newton's deployment of a single shock from the tazer to force Robertson to drop the knife while she was in close contact with Sergeant Nagy fall well short of the deadly force found permissible in similar cases. *Compare Harris*, 745 F.3d at 770-71 (officers tased a suicidal man lying on a bed who was refusing to let go of a knife; they subsequently shot him when he stood up and began flailing the knife after being tased); *Elizondo*, 671 F.3d at 508 (officer shot a suicidal teenager in the teenager's bedroom when he refused to put down a knife he was holding to his own abdomen and ignored the officer's commands to stay back). Thus, the officers' actions are well within the bounds of constitutionally permissible force. *Harris*, 745 F.3d at 772. Because the City's liability for a policy promoting or ratifying excessive force is dependent on Robertson's establishing a Fourth Amendment violation, the

City is also entitled to summary judgment on this claim. *Heller,* 475 U.S. 796, 800; *Mace,* 333 F.3d at 625.

Robertson's claim that the City violated the ADA by failing to train its officers on reasonable accommodations for the mentally ill also fails, because the summary judgment establishes all the officers on the scene actually had training in responding to mental health crises at the time of the incident. *See supra,* Section I and record cites therein. (In fact, the first officer on the scene was a licensed Mental Health Officer. *Id.*) Furthermore, the ADA's requirement of reasonable accommodation is not implicated by the actions an officer takes to secure an armed, potentially violent suspect. *Hainze,* 207 F.3d at 801-02. The ADA requires officers to make reasonable accommodations for a suspect only after the scene is secure and safety concerns have been addressed. *Id.* The summary judgment evidence unequivocally shows the officers used reasonable force to contain the immediate threat to human safety posed by Robertson's refusal to give up the knife and remain in the area controlled by the officers. *Harris,* 745 F.3d at 772. Once that threat was contained, the officers quickly obtained medical assistance for Robertson and allowed her mother to assume responsibility for transporting her to Austin State Hospital rather than arresting her. *See supra,* Section I and record cites therein. There is no evidence establishing Robertson suffered any damages attributable to any officer's failure to accommodate her disability once the scene was secure. *Id.* Robertson has thus failed to outline any violation of her rights under federal law. *Hainze,* 207 F.3d at 801-02. Defendants are entitled to summary judgment on her ADA claims. *Id.*

## IV.  CONCLUSION

For the reasons outlined above,

IT IS ORDERED that the Motion for Summary Judgment on Behalf of Defendants filed July 17, 2015 [Dkt. #23] is GRANTED.

IT IS FURTHER ORDERED that Plaintiff's claims against all Defendants are DISMISSED WITH PREJUDICE.

IT IS FINALLY ORDERED that any pending motions remaining in this matter are DISMISSED as MOOT.

SIGNED October 29, 2015.

*/s/ Sam Sparks*
SAM SPARKS
UNITED STATES DISTRICT JUDGE